**SCHWINN BICYCLE COMPANY, an Illinois corporation, Plaintiff,**

v.

**ROSS BICYCLES, INC., a New York corporation, Defendant.**

**No. 87 C 0914.**

United States District Court, N.D. Illinois, E.D.

Jan. 25, 1988.

Richard L. Reinish, Donald G. Mulack, Malcolm McCaleb, Jr., Michael J. Allen, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Robert V. Jambor, Stephen J. Manich, Daniel C. McEachran, Kinzer, Plyer, Dorn, McEachran & Jambor, Chicago, Ill., Burton L. Lilling, Bruce E. Lilling, Lilling & Greenspan, White Plains, N.Y., Bernard J. Cantor, Cullen, Sloman, Cantor, Grauer, et al., Detroit, Mich., for defendant.

## MEMORANDUM OPINION
## AND ORDER

WILLIAM T. HART, District Judge.

Plaintiff Schwinn Bicycle Company ("Schwinn") brought this action against de-

fendant Ross Bicycles, Inc. ("Ross") under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging unfair competition through Ross' appropriation of Schwinn's Air–Dyne exercise bicycle trade dress.[1] Schwinn moved for a temporary restraining order and a preliminary injunction. This court referred the case to the assigned magistrate for a hearing and report on the motion for a preliminary injunction. Following a nine-day hearing, the magistrate issued a report recommending that the motion for a preliminary injunction be denied. Presently before the court are the parties' objections to the magistrate's report and recommendation pursuant to Fed.R.Civ.P. 72(b).

Ross objects narrowly to the admission into evidence of a survey submitted by Schwinn on the issues of secondary meaning and likelihood of confusion. Schwinn objects more generally that the magistrate erred in finding: (1) that there was negligible evidence of some likelihood of consumer confusion; and (2) that Ross will be able to show that the overall appearance of the Air–Dyne is functional. For the reasons stated below, this court overrules Ross' objections relating to the use of the survey at the hearing. However, the court disagrees with the magistrate's conclusions that Schwinn is not likely to establish some likelihood of consumer confusion at trial and that Ross is likely to prevail on the issue of functionality. The court therefore finds that Schwinn has satisfied the standards for preliminary injunctive relief.[2]

## FACTS

Schwinn is an old, well-established bicycle manufacturer whose name is commonly known and associated with bicycles. Since 1978, Schwinn has marketed an "air displacement"-type exercise bicycle known as the Air–Dyne. The appearance of the Air–Dyne, including its long arms which move back and forth, in combination within a large (27 inch) wheel and the possibility of simultaneous arm and leg movement, is unique. Until recently, although there were more than 100 exercise bicycles on the market, no other manufacturer sold an exercise bicycle that looks or performs like the Air–Dyne.

In 1986, Ross, also a well-established bicycle manufacturer, developed a competitive exercise bicycle which is similar to the Air–Dyne in a number of respects but which avoids the Air–Dyne patent.[3] Both the Air–Dyne and the Ross prototype work by means of air displacement, with the principle of the resistance force being air moving in and being forced out by way of air veins mounted on spokes on the bicycle wheel. As the user pedals or moves the arms back and forth, the wheel is pushed around and air is pushed out, in much the same way as with an ordinary fan.

Ross displayed several early prototypes of its exercise bicycle at a series of trade shows in late 1986 and early 1987. Each prototype differed from its predecessor in certain respects, and each was progressively more differentiated from the Air–Dyne. Nevertheless, the final prototype, shown in February, 1987, is strikingly similar in appearance to the Air–Dyne. In addition to the fact that the Air–Dyne and the Ross bike are basically identical in shape, the arms of the two machines are shaped nearly the same, the wheel and enclosing cage are of the same size and configuration, and the rear and bases of the two bikes are nearly identical. While Ross uses the color cream where Schwinn has used chrome, and chrome where Schwinn uses white, the overall white and chrome effect of the two exercisers is also similar.

However, there are a number of differences between the two exercise bicycles. For example, the Ross prototype has no connecting mechanism between the pedals

---

1. Schwinn also raises various state law claims, but those claims are not relevant to the motion presently before the court.

2. Pursuant to Fed.R.Civ.P. 52(a), this memorandum opinion and order shall serve as the court's findings of fact and conclusions of law.

3. Ross holds its own patent on the machine's connecting gear.

and the handlebars, but instead, has its gear connecting mechanism contained in a large pear-shaped enclosure on the large front wheel. In addition, the arms of the Ross exercise bicycle are longer than those on the Air–Dyne, the Ross bike has no footrests, it has straps on the foot pedals, it has a black locking device, the console or control is a different shape and has electronic controls, there are no black markings on the base, the seat is different, the small wheels in front of the machine are slightly larger and made of metal rather than plastic, the tubular steel arms are of different diameters, and there are design differences between the two chain covers and their connecting braces. Finally, the name "Ross" appears on the Ross bicycle in eleven separate places. Some of these marks, however, are in rather small letters at the bottom of decals containing the letter "R".[4]

Schwinn's claimed trade dress appears to relate primarily to the front portion of the bike (comprising the large bicycle wheel fan, surrounded by the wire fan guard or cage, with the long handle-arm levers that separately move back and forth). Schwinn's counsel conceded at the hearing that the rear frame of the Air–Dyne is not particularly distinctive, and indeed, the back end parts of the bike have been used for a number of years on other exercise bikes made by Schwinn, Ross, and several other competitors.

## DISCUSSION

■ In order to prevail on its motion for a preliminary injunction, Schwinn must show (1) that it has no adequate remedy at law; (2) that it will suffer "irreparable harm" if the injunction is not granted, which must be weighed against the pro-

spective harm to Ross; (3) that there is some likelihood that it will succeed on the merits (something better than a negligible chance, with the likelihood of success to be weighed in the balance of harms to each party); and (4) that the public interest will not be disserved. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir.1984); *see also Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance Co.*, 784 F.2d 1325 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986).[5]

■ In this case, as in the usual trade dress case, lack of an adequate remedy at law and irreparable harm are presumed. *See A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1088–89 (N.D.Ill. 1985), *aff'd*, 796 F.2d 903 (7th Cir.1986). In addition, no objection has been raised to the magistrate's finding that the public interest will not be disserved by the issuance of a preliminary injunction. Thus, the only requirement for injunctive relief in dispute here is the likelihood that Schwinn will ultimately prevail on the merits of the case.

■ A trade dress that is confusingly similar to the trade dress adopted by a competitor constitutes unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 608 (7th Cir.1986); *Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1159 (N.D.Ill.1987). "A product's trade dress is the overall image used to present it to purchasers; it could thus include ... the product's size, shape, color, graphics, packaging, and label." *Vaughan Mfg. Co. v. Brikam International, Inc.*, 814 F.2d 346, 348 n. 2 (7th Cir.1987).

---

**4.** Ross has also made several mechanical changes that differentiate it from the Air–Dyne. For example, because of the "free wheeling" feature on the Ross, a user can leave his or her feet free while using the arms alone. The Ross exerciser also uses toe-straps and contains several additional engineering innovations not found on the Air–Dyne.

**5.** Recently, the Seventh Circuit has also explained that an injunction should issue

only if the harm to the plaintiff if the injunction is denied, multiplied by the probability that the denial would be in error (that the plaintiff, in other words, will win at trial), exceeds the harm to the defendant if the injunction is granted, multiplied by the probability that granting the injunction would be in error.

*American Hospital Supply Corp. v. Hospital Products, Ltd.*, 780 F.2d 589, 593 (7th Cir.1986).

In order for a manufacturer to prevail on a claim for trade dress infringement, it must first establish that its trade dress is protectible as a trademark—i.e., either that it is "inherently distinctive" or that it has acquired "secondary meaning" to consumers. *Blue Coral, supra* at 1159. In addition, the manufacturer must show some "likelihood of confusion" on the part of consumers as to the source of the product. *Id.; see also Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 365 (N.D.Ill.1984). Even if both of these requirements are satisfied, however, a plaintiff cannot prevail if the alleged appropriated trade dress is found to be "functional." *Stormy Clime Ltd. v. Progroup, Inc.*, 809 F.2d 971 (2d Cir.1987).[6] Each of these elements—secondary meaning, likelihood of confusion, and functionality—must be separately considered.

### SECONDARY MEANING

The magistrate in this case correctly found that the overall configuration of the Schwinn Air–Dyne has acquired secondary meaning. "Secondary meaning" in the context of Section 43(a) of the Lanham Act denotes an association in the mind of the consumer between the trade dress of the product and a particular producer. *Vaughan Mfg. Co. v. Brikam International, Inc.*, 814 F.2d 346, 348 (7th Cir.1987); *see also A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir.1986). Secondary meaning need not be shown where the trade dress, by itself, is a distinctive, identifying mark; however, it must be shown where the trade dress is not inherently distinctive but is claimed to have become identified with a particular producer over time. *Vaughan, supra* at 348; *see also Blau Plumbing, Inc. v. S.O.S. Fix–It,*

*Inc.*, 781 F.2d 604, 608 (7th Cir.1986). A product's trade dress has acquired secondary meaning "when the purchasing public associates that dress with a single producer or source rather than just with the product itself." *LeSportsac, Inc. v. K–Mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985).

### The Survey Evidence

At the hearing before the magistrate, Schwinn introduced into evidence the results of a market survey conducted by an independent consultant. Twenty-six professional buyers of exercise equipment at Chicago-area gymnasiums and health clubs were selected at random to examine a photograph of the final Ross prototype which had all Ross identifying marks deliberately removed. Respondents were asked three questions. First, they were asked, "Who do you think puts out the product shown in this picture?" If a specific company was named, respondents were asked, "What makes you think so?," and finally, "What other products or brands, if any, do you think are put out by the company that puts out the product shown in this picture?" An "unqualified" association with Schwinn was made by 34.6% (nine) of the respondents. Another 34.6% made a "qualified" association with Schwinn. Schwinn offered the survey results on the questions of both secondary meaning and likelihood of confusion.

On the issue of secondary meaning, the magistrate, noting the small sample size and the somewhat ambiguous nature of the questions presented, found the survey results to be inconclusive. Notwithstanding these reservations, however, the magistrate concluded that Schwinn would likely be able to establish that the Air–Dyne had acquired secondary meaning in the market-

---

**6.** Ross, in its response to Schwinn's objections to the magistrate's report and recommendation, cites *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), where the Supreme Court held that articles unprotected by patents are in the public domain and may be freely copied and sold. Ross does not seriously dispute, however, that Section 43(a) of the Lanham Act expressly prohibits

monopolization of non-functional features which are either distinctive or have acquired secondary meaning, where there is a likelihood of confusion to purchasers. "It is well established that the *Sears–Compco* doctrine does not restrict the scope of Section 43(a) of the Lanham Act.... '[T]here is no suggestion in the *Sears* and *Compco* cases that federal patent policy somehow limited the scope of Section 43(a).'" *Howw Mfg., Inc. v. Formac, Inc.*, 213 U.S.P.Q. 793, 796–97 (N.D.Ill.1981).

place, based on the survey evidence coupled with the evidence that (1) the Air–Dyne had a distinctive shape; (2) Schwinn has been selling the Air–Dyne since 1978, with great success; and (3) Ross intentionally copied the Air–Dyne's basic shape, silhouette, and primary features. While the magistrate's findings with respect to secondary meaning were thus based on some evidence independent of the survey, Ross objects that the survey should not have been considered at all. Ross' argument is that the finding of secondary meaning could not be made without considering the survey evidence, and that the survey was itself invalid.

Ross' primary objection to the survey is not the small sample size or the form of the questions used,[7] but rather, focuses on the fact that Ross' trademark and logo had been removed from the photograph before it was shown to the respondents. Ross points to the testimony of the surveyor who stated at the hearing that, in his opinion, the name and logo are a part of the exercise bicycle's trade dress, that the removal of the name and logo changed the trade dress and possibly the results of the survey, and that if the name and logo had not been removed, respondents would probably have identified the machine as coming from Ross.

The legal definition of a product's trade dress does include its label. *Vaughan, supra* at 348 n. 2. It does not follow, however, that the removal of Ross' name and logo from the photograph negates altogether the trade dress survey. The surveyor testified at the hearing that, in his opinion, the proper way to conduct a survey to determine the possibility of confusion in a trade dress case was to remove the name or trademark of the manufacturer. Indeed, the law is clear that such removal may be necessary in determining whether or not some other claimed indicia of origin (such as shape or configuration) has acquired secondary meaning. *See Harlequin Enterprises, Ltd. v. Gulf & Western Corp.,* 503 F.Supp. 647, 650–51 (S.D.N.Y. 1980), *aff'd,* 644 F.2d 946 (2d Cir.1981); *RJR Foods, Inc. v. White Rock Corp.,* 201 U.S.P.Q. 578, 581 n. 6 (S.D.N.Y.1978), *aff'd,* 603 F.2d 1058 (2d Cir.1979). As the surveyor in this case explained, leaving the name "Ross" on the photograph of the bike where it appeared in the "undoctored" photograph would have made the survey "degenerate and be nothing more or less than a word association test." Thus, despite the fact that the photograph shown to survey respondents did not include the Ross name and logo, the magistrate did not err in admitting the survey results into evidence on the issue of secondary meaning.

### Marketing Success and Intentional Copying

■ In any event, the magistrate properly found that Schwinn could likely establish secondary meaning *independent of* the survey evidence. In *Vaughan,* the Seventh Circuit declined to decide the issue whether a presumption of secondary meaning arises when a junior competitor deliberately and closely copies the trade dress of a senior competitor in the market. *Id.* at 349.[8] The court did state, however, that proof of intentional copying was at least *probative evidence* of secondary meaning. *Id.* In *Vaughan,* the court found evidence of such intentional copying, coupled with evidence that the manufacturer had dominated the market for more than 40 years and expended considerable sums to display its product over that period, sufficient to establish that the manufacturer was likely to succeed in showing that its trade dress had acquired secondary meaning over time. *Id.* The court also stated that a consumer survey (like the one whose validity Ross

---

**7.** A question nearly identical in form has been held proper by the Seventh Circuit in a likelihood of confusion survey. *See Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 385–87 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

**8.** Some other courts have suggested that a finding of copying by a defendant in a trade dress case may, in itself, give rise to a presumption of

secondary meaning. *See, e.g., M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 449–50 (4th Cir. 1986); *Hartford House, Ltd. v. Hallmark Cards, Inc.,* 647 F.Supp. 1533, 1542 (D.Colo.1986). However, the Seventh Circuit has stated that proof of intentional copying alone does not eliminate the need for additional proof of secondary meaning. *Blau Plumbing, supra* at 611.

disputes here) is not even required in order to establish secondary meaning. *Id.*

■ In this case, Schwinn's success in marketing the Air–Dyne for nearly a decade,[9] coupled with the undisputed evidence of intentional copying by Ross,[10] are sufficient to support a finding that Schwinn is likely to succeed in establishing secondary meaning at trial—even independent of the somewhat ambiguous survey results.[11] Schwinn has continuously used and promoted the distinctive trade dress of the Air–Dyne since its introduction in 1978, and has spent well over 4 million dollars in advertising. Although some of that advertising, including a radio campaign on the popular Paul Harvey show that Schwinn has run since 1985, is directed at the benefits of using the bike and does not visually describe the Air–Dyne,[12] some of the advertising has, in fact, focused on the machine's distinctive trade dress and appearance. The magistrate's finding that Ross copied the basic shape, silhouette and most features of the Air–Dyne with the intent to capitalize on the good will Schwinn has established with the Air–Dyne, was also supported by the evidence and also supports the inference that the Air–Dyne has achieved secondary meaning.[13]

## LIKELIHOOD OF CONFUSION

### The Survey Evidence

■ Although the magistrate correctly found that Schwinn is likely to succeed in proving secondary meaning at trial, based in part on the survey, she also found that the survey did *not* constitute evidence of either actual confusion or likelihood of consumer confusion. This is because the photograph, with the identity of the manufacturer deleted, does not depict the Ross exercise bicycle under the marketing conditions that it would be offered for sale to purchasers. As the magistrate noted in her report, courts have frequently rejected surveys for purposes of showing likelihood of consumer confusion (as opposed to secondary meaning) under similar circumstances. *See, e.g., American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 661–62 n. 4 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Sunbeam Corp. v. Equity Industries Corp.,* 635 F.Supp. 625 (E.D.Va.1986), *aff'd,* 811 F.2d 1505 (4th Cir.1987). As discussed above, deleting the manufacturer's name may be necessary in determining whether some other claimed indicia of origin has acquired a secondary meaning. In a likelihood of confusion survey, by contrast, removing the manufacturer's name

9. Schwinn has sold over 200,000 Air–Dynes since commencing manufacture in 1978.

10. The evidence is uncontradicted that the president of Ross purchased a Schwinn Air–Dyne for the specific purpose of using it in designing around the Schwinn patent. Although some engineering improvements were made by Ross, the basic design—apart from the gear—was taken from Schwinn.

11. Schwinn argues that the magistrate erred in concluding that the "qualified" associations of 34.6% of the respondents with Schwinn were not probative of secondary meaning. If those tentative responses are added to the responses showing an unqualified association, the percentage of respondents making some association of the exercise bicycle in the photograph with Schwinn rises to 69.2%. However, given that the form of the questions asked was less than optimal for eliciting the information desired (i.e., whether the trade dress was associated with *only one* producer), the magistrate properly omitted from consideration the 34.6% "qualified" responses. As the magistrate also noted, it may be significant that the purchasers surveyed

were professionals in the field but still appeared to have no stronger identification with Schwinn than the survey indicated.

12. Several witnesses testified that the ads on the Paul Harvey show have been particularly successful in creating a demand for the Air–Dyne.

13. Ross also disputes the magistrate's finding that Schwinn is likely to prove secondary meaning on the claimed basis that the trade dress only identifies the *type of product* and not its source. *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). Ross claims that bicycle purchasers typically rely on advertised brand name, and not on appearance, to identify the source of the product. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir.1987) (advertising and promotional activities must feature in some way the trade dress itself). However, Ross acknowledges in its brief that the final resolution of this issue must await a trial on the merits.

eliminates a cue as to the origin of the product—a cue which in an *actual* purchasing situation might well reduce the level of confusion. *Cf. A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1092–93 (N.D.Ill.1985), *aff'd*, 796 F.2d 903 (7th Cir. 1986). Thus, contrary to Schwinn's contention, the magistrate properly disregarded the survey evidence in making her findings as to the likelihood of consumer confusion.

A second reason the survey was properly disregarded for this purpose is that the buyers surveyed were professionals in purchasing fitness equipment, and for that reason, probably are not representative of the general consuming public. The fact that these buyers were interviewed at their own offices also ignores the reality of the marketplace—i.e., the fact that the exercise bicycles can be bought only from authorized Schwinn or Ross dealers. As one court has observed:

> If the interviewee is not in a buying mood, but is just in a friendly mood answering a pollster, his degree of attention is far different from what it would be had he his wallet in his hand. Many men do not take the same trouble to avoid confusion when they spend their cash.

*American Luggage Works, Inc. v. United States Trunk Co.*, 158 F.Supp. 50, 53 (D.Mass.1957), *aff'd sub nom. Hawley Products Co. v. United States Trunk Co.*, 259 F.2d 69, 77 (1st Cir.1958).

### The Presumption of Confusion

■ Although the magistrate properly excluded the results of the survey in assessing the likelihood of consumer confusion, she erred in her overall determination that Schwinn is not likely to establish a likelihood of consumer confusion at trial.[14] In making her findings with regard to this element of Schwinn's case, the magistrate accorded insufficient weight to a number of factors—including a presumption which arises from the evidence of secondary meaning and the Air–Dyne's distinctive appearance, coupled with the evidence of Ross' intentional copying.

As previously discussed, the magistrate correctly found, based on the evidence at the hearing, both that (1) the Air–Dyne trade dress probably has acquired secondary meaning; and (2) that Ross intentionally copied the Air–Dyne trade dress. These findings, while perhaps not alone sufficient to give rise to a likelihood of confusion, at least give rise to a *presumption* of likelihood of confusion. *LeSportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 79 (2d Cir.1985); *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 434 (5th Cir.1984); *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir.1981). As one court has stated, "[w]here a product's design has achieved secondary meaning, confusion is a likely consequence of copying." *LeSportsac, supra* at 79.

Indeed, even where secondary meaning has *not* been established, a finding of intent to copy and "cash in" on the plaintiff's reputation and good will may, standing alone, justify a finding of likelihood of confusion. *Sicilia, supra* at 434; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983). As the Seventh Circuit has stated, "[i]n instances of intentional copying the second comer is generally presumed to have intended to create a confusing similarity of appearance *and to have succeeded at doing so.*" *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir.1982) (emphasis added). *See also Chemlawn Services Corp. v. GNC Pumps, Inc.*, 652 F.Supp. 1382, 1393 (S.D.Tex.1987), *rev'd on other grounds*, 823 F.2d 515 (Fed.Cir.1987) ("[c]ourts almost unanimously presume a likelihood of confusion based upon a showing that the defendant intentionally copied the plaintiff's trade dress"). The magistrate's finding that Ross intended to exploit and capitalize on the good will of the Schwinn Air–Dyne, as previously noted, finds ample support in the record. This finding, especially when viewed in conjunction with the equally well-supported finding

14. There is no issue in this case as to confusion on the part of Schwinn *dealers*; Schwinn now concedes, and the evidence clearly shows, that there is no basis for concluding that dealers will be confused as to the source of the exercisers they sell.

of secondary meaning, suggests that there is more than a negligible chance that Schwinn will be able to prevail in establishing a likelihood of confusion at trial.

### The Digits of Confusion

■ The probability that Schwinn will be able to establish a likelihood of consumer confusion is further demonstrated in this case when the "digits of confusion" test is applied. Under this test, likelihood of confusion is determined by examining a number of factors, including: the type of trade dress at issue; the similarity of design; similarity of products; identity of retail outlets and purchasers; identity of advertising media used; the alleged infringer's intent; and actual confusion. *See Wesley–Jessen Div. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 866 (7th Cir.1983); *see also Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 381–82 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). A plaintiff need not establish that *each* digit of confusion weighs in its favor in order to establish a likelihood of confusion. *See Sicilia, supra* at 434. Recently, for example, a likelihood of confusion was found based on the presence of seven digits, excluding only the digit of actual confusion. *Chemlawn Services, supra* at 1393 (involving lawn spray gun).[15]

■ In this case, similar to *Chemlawn,* each of the digits of confusion—with the exception of actual confusion—was supported in the evidence. First, the findings with respect to the distinctiveness and secondary meaning of the Air–Dyne establish the strength of the bicycle's trade dress.

Second, as the magistrate specifically pointed out in her report, "the average viewer would immediately be struck by the similarities in appearance between the two machines. The basic shape of the two machines is identical." Third, since both products are exercisers, the "similarity of products" is clear. Fourth, with respect to the identity of the retail outlets and purchasers, the evidence shows that both the Schwinn Air–Dyne and the Ross prototype are sold through independent bicycle dealers, some of which sell both Schwinn and Ross products. Both products would appeal to the same consumers. Fifth, similar advertising media are used by the two companies to market the machines. Finally, as already noted, the magistrate correctly found that Ross intentionally copied the Air–Dyne for the purpose of capitalizing on Schwinn's own good will.

The only digit of confusion not established in this case is "actual confusion," but, as noted above, the law is clear that a plaintiff need *not* demonstrate actual confusion in order to show a likelihood of confusion. *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1172–73 (7th Cir.1986); *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 647 F.Supp. 1533, 1544 (D.Colo.1986); *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F.Supp. 1204, 1223 (D.N.J.1985), *aff'd*, 807 F.2d 1136 (3d Cir.1986).[16] The magistrate's failure to conclude that there was sufficient evidence of a likelihood of confusion based on the digits of confusion test was thus in error.

---

**15.** The digits of confusion present in *Chemlawn* were: intent to copy; similarity of design; similarity of product; similarity of outlets; similarity of customers; similarity of advertising media; and strength of the mark involved.

**16.** Schwinn argues that the magistrate also erred in failing to find the digit of "actual confusion," citing the deposition testimony of two Schwinn dealers (one of whom is also a Ross dealer), the in-court testimony of a bicycle owner who sells neither Schwinn nor Ross bicycles, and the affidavits of twenty-eight independent bicycle dealers from around the country, offered by Schwinn to show that dealers believe consumers are likely to be confused between the two bikes. Schwinn's argument on this point is without merit. As the magistrate cor-

rectly noted, most of the persons who signed the affidavits had seen earlier prototypes of the exerciser that did not display the Ross name and did not reflect several other design changes later made by Ross which further differentiated the two machines. In addition, the testimony of Schwinn's two bicycle dealer witnesses relative to confusion was contradicted by the testimony of another dealer who sells both Schwinn and Ross bikes. That dealer testified that customers generally do not ask for Schwinn Air–Dyne by appearance, but that many customers, instead, have asked for the "new Schwinn exerciser advertised on the Paul Harvey Show" (a reference to the weekly radio commercial which does not visually describe the Air–Dyne in any way).

### The Conditions of Purchase

In determining whether there is a likelihood of consumer confusion in a trade dress case, the issue is not whether the goods would be confused by a casual observer, but rather, whether the goods would be confused by a prospective purchaser at the time he or she considered making the purchase. *American Luggage Works, supra* at 53. As the magistrate properly took into account in this case,

> The test for [trade dress] infringement is generally stated to be 'likelihood of confusion' of ordinary purchasers purchasing in the ordinary manner....
>
> The test is not simply a 'side-by-side' one, made by the court through a personal comparison, but rather is one of consumer confusion, in light of the manner in which consumers purchase these products.

*Mr. Travel, Inc. v. V.I.P. Travel Service, Inc.,* 268 F.Supp. 958 (N.D.Ill.1966), *aff'd,* 385 F.2d 420 (7th Cir.1967); *see also Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Div.,* 261 F.Supp. 200, 205 (N.D.Ill.1966), *aff'd,* 394 F.2d 833 (7th Cir.1967). Employing this test, as discussed below, the magistrate placed great emphasis on the evidence adduced at the preliminary injunction hearing with regard to the manner in which consumers actually purchase the Air–Dyne and other exercise bicycles. In focusing on these considerations, however, the magistrate applied the reasoning of a line of cases whose applicability is questionable where, as in this case, secondary meaning has already been inferred.

The evidence shows that Schwinn's exercise bicycles are sold only through authorized Schwinn dealers—generally small, individually-owned shops specializing in the sale and servicing of bicycles and accessories. The shops are conspicuously labeled with signs bearing Schwinn's name, and contain numerous Schwinn products likewise plainly marked with Schwinn's name. Similarly, the Ross exercise bicycle is sold only by authorized Ross dealer bicycle shops which are clearly identified with the Ross name and contain products clearly bearing the Ross name. Some shops are authorized for both Schwinn and Ross bicycles, and in those cases, the shops are marked with both brand names.

All bikes are available for purchaser tryout before purchase, and most customers do, in fact, try out the machines before purchasing them. Salespersons routinely give explanations relating to the operation and benefits of the bike. Both the Air-Dyne and the Ross exercise bicycle are expected to retail for about $600.00, and thus can appropriately be characterized as "high-ticket" items. The evidence indicates that most exercise bicycles are purchased with considerable care by brand-conscious consumers who are concerned with the exercise and health benefits to be gotten from the use of the bikes. The average purchase takes about 45 minutes.

In concluding that Schwinn was unlikely to establish a likelihood of consumer confusion at trial, the magistrate placed primary reliance on these conditions of purchase, and more particularly, on the fact that the exercisers are (1) relatively expensive items which are ordinarily purchased with a high degree of care; and (2) clearly labeled with the respective manufacturers' names. These factors, however, as discussed below, are entitled to significantly less weight in a case where a product has already acquired secondary meaning.

### Price of the Products

As noted above, the magistrate's conclusion that Schwinn is unlikely to establish a likelihood of confusion at trial was based in large part on her view that a reasonably prudent customer would be especially discriminating and exercise a high degree of care in purchasing the exercisers at issue in this case, since they are relatively expensive items. It is well settled, however, that increased consumer care in purchasing higher-priced products does not necessarily eliminate the likelihood of confusion. Likelihood of confusion has frequently been found even where the goods at issue are relatively expensive. *See, e.g., Truck Equipment Service Co. v. Fruehof Corp.,* 536 F.2d 1210, 1220–21 (8th Cir. 1976) (semi-trailers); *AMF, Inc. v. Sleek-*

*craft Boats,* 599 F.2d 341, 353 (9th Cir. 1979) (motor boats); *Gotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 365 F.Supp. 707, 716–17 (S.D.N.Y. 1973), *aff'd,* 523 F.2d 1331 (2d Cir.1975) (pianos).

The mere fact that purchasers may be sophisticated or discriminating also is insufficient to preclude a likelihood of confusion. *Steinway, supra* at 717. "[T]he law protects the 'ignorant, the inexperienced, and the gullible' as well as the worldly wise, the intelligent, and the astute." *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 614 (7th Cir.1965), *quoting Stork Restaurant v. Sahati,* 166 F.2d 348, 349 (9th Cir.1948). *See also Sleekcraft Boats, supra* at 353; *Fotomat Corp. v. Cochran,* 437 F.Supp. 1231, 1244 (D.Kan. 1977); *Marquis Who's Who, Inc. v. North American Advertising Assoc., Inc.,* 426 F.Supp. 139, 143 n. 5 (D.D.C.1976), *aff'd,* 574 F.2d 637 (D.C.Cir.1978). Thus, the mere fact that exercise bicycles are expensive and that people who buy them are typically discriminating is not alone sufficient to preclude the possibility of a likelihood of consumer confusion.

### Brand Labeling

■ The magistrate also relied in large part on the fact that both Schwinn and Ross have displayed their names on their respective exercisers in a number of places. As noted, Schwinn's bicycle has the Schwinn brand name in seven places and the Air–Dyne model name in three places; the Ross bike has the Ross brand name or logo in eleven places, and the Futura model name in two places. The magistrate reasoned that the prominent display of these brand names on the products would preclude confusion even though the products may otherwise look similar on casual observation. The law is clear, however, that a manufacturer cannot eliminate a likelihood of confusion simply by applying its own name to a product where the product which it resembles has already been found (as in this case) to have secondary meaning. *See, e.g., Truck Equipment Serv., supra* at 1220–21; *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972); *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970); *A.J. Canfield Co., supra* at 1091; *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.,* 217 U.S.P.Q. 617, 620 (S.D.N.Y.1982); *Teledyne Industries, Inc. v. Windmere Products, Inc.,* 433 F.Supp. 710, 739 (S.D.Fla. 1977); *Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555, 560 (S.D.N.Y.1978).[17] While it is true, as the magistrate noted, that a label in some case may make "at least some difference," a label cannot altogether preclude the possibility of likelihood of confusion because consumers may still be drawn to the infringing product in the first place, and misled into an initial interest in the product, because its trade dress so closely resembles that of the other, already familiar product. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir. 1987).[18]

---

**17.** The magistrate distinguished two of these cases—*Truck Equipment* and *Revlon*—on the basis that in those cases, the defendant—not the plaintiff—was the "dominant figure" in the market. However, no legal basis for this distinction is cited. The magistrate stated that "[t]he courts are divided on the importance, and the effect, of a junior manufacturer's defense on the basis that it identifies the product by its own name." The split of authority identified by the magistrate, however, actually appears to be a split between those cases where distinctiveness or secondary meaning has already been established and those where it has not.

**18.** Most (though not all) bicycle dealerships sell either Schwinn *or* Ross bikes, but not both. Ross argues that because of this, and because the dealerships themselves are so conspicuously labeled, there is no way that a prospective purchaser, shopping in what is clearly a Ross shop, could be confused into believing that he or she is buying a Schwinn exerciser in that store. This may be true, but at the same time, the fact that most Schwinn dealers do not handle Ross bikes and vice versa precludes the ability of at least some customers to view and try out both exercisers, at least in the same location. This, in turn, undercuts the magistrate's assumption that most customers would carefully study and ride both bikes before deciding which to buy. Interestingly, the magistrate acknowledged that a side-by-side comparison is not the test, *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979); *Source Perrier, supra* at 620, but still went to state that "[n]evertheless, no

The magistrate's reliance on *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423 (Fed.Cir.1984) in this regard is misplaced because in *Litton*, unlike this case, the court never specifically ruled on the issue of secondary meaning. The court in *Litton* noted only that the similarity in design between the two products at issue— Whirlpool and Litton microwave ovens— was essentially a similarity shared by many other microwave ovens on the market. Thus, in *Litton*, the *only* feasible method by which the manufacturers could distinguish their products was by prominently displaying their respective trade names. Here, by contrast, no other exerciser on the market (except for the Ross) apparently even remotely resembles the unique Air–Dyne design,[19] and there is at least *some* evidence that *some* (though not many) customers purchase the bike based on recognition of its distinctive appearance, since they ask for the Air–Dyne *only* by describing its appearance. Thus, the fact that the Air–Dyne in this case has acquired secondary meaning renders the mere fact of labeling significantly less important here than it was in *Litton*.

The other cases relied on by the magistrate in support of her conclusion that name identification is a significant factor, like *Litton*, all involve situations where the trade dress was non-distinctive and had not acquired secondary meaning. *See, e.g., Sunbeam Corp., supra* at 631; *Fisher*

*Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193 (1st Cir.1980); *Bose Corp. v. Linear Design Labs*, 467 F.2d 304 (2d Cir. 1972); *Black & Decker, Inc. v. North American Philips Corp.*, 632 F.Supp. 185 (D.Conn.1986). Where, as here, secondary meaning has been found likely to exist, the usual cases relating to labeling and brand names do not apply because the product has already become identified with a single source through its appearance.[20]

Therefore, Schwinn is likely to establish a likelihood of consumer confusion at trial. First, as discussed above, the distinctiveness and secondary meaning of the Air–Dyne, coupled with Ross' acknowledged copying with intent to benefit from the good will of the Air–Dyne, create a presumption of at least some likelihood of confusion. Second, the fact that virtually every "digit of confusion," with the exception of "actual confusion," has been satisfied in this case, shows a likelihood of consumer confusion. Finally, the magistrate largely ignored the body of caselaw which suggests that neither the type of customer, the price of the product, nor the fact that the product may be labeled, are sufficient to obviate consumer confusion where, as here, secondary meaning has been achieved. For all of these reasons, the court finds that Schwinn is likely to prevail on the "likelihood of confusion" element of its case at trial.[21]

one carefully shopping for, and riding, both the Air–Dyne and Ross prototypes would fail to notice the differences between the two."

19. Although Ross introduced evidence that brand name was important with respect to the sale of bicycles—which basically all look alike— exercisers, unlike bicycles, vary dramatically in appearance, making brand name identification considerably less important.

20. The magistrate also essentially overlooked the possibility that even with the brand names conspicuously posted, some consumers could believe that Ross had obtained a license for Schwinn to market the Air–Dyne.

21. Schwinn contends that the magistrate also erred by treating "passing off" as an additional requirement for a determination of likelihood of consumer confusion. In her report, after finding that Ross had "copied the Air–Dyne to

take advantage of the tremendous good will built up by Schwinn through its extensive marketing efforts" and that Ross "hopes to sell its own Air–Dyne on the basis of the good will already established," the magistrate noted that there was little evidence that Ross would try to "pass off" its exercise bicycle as a Schwinn. This is essentially the only mention of "passing off" in the report, however, and this court cannot infer that, by her inclusion of this language, the magistrate intended to include "passing off" as a necessary element for likelihood of confusion. Schwinn is, of course, correct that in order to succeed in an action for unfair competition under Section 43(a) of the Lanham Act, a plaintiff need not establish that the defendant had an intent to "pass off" its product as that of the plaintiff. *See Sicilia, supra* at 431; *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980); *G's Bottoms Up Social Club v. F.P.M. Industries, Inc.*, 574 F.Supp. 1490, 1495 (S.D.N.Y.1983).

## FUNCTIONALITY

Schwinn also objects to the magistrate's finding that it is likely that Ross will be able to show at trial that the basic design of the Air–Dyne is functional. Schwinn contends that Ross presented insufficient data to sustain its burden of establishing functionality; that the magistrate erred by focusing on the individual components of the bike rather than on the overall trade dress; and that the magistrate improperly took into account aesthetic considerations in her analysis of functionality.

Functionality is a defense to a suit under section 43(a) of the Lanham Act, and the burden of proof of establishing functionality is on the defendant. *Vaughan Mfg. Co. v. Brikam International, Inc.,* 814 F.2d 346, 349 (7th Cir.1987); *see also Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 520 (10th Cir.1987). In this case, the court agrees with Schwinn that the magistrate's conclusion that Ross will likely be able to meet its burden of establishing functionality at trial was in error.

The Supreme Court has stated that a product feature is "functional" if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). The Seventh Circuit, similarly, has stated:

> [A] functional feature is one which competitors would have to spend money not to copy but to design around, as they would have to do if they wanted to come up with a nonoval substitute for a football. It is something costly to do without ..., rather than costly to have....

*W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 338 (7th Cir.1985). *See also Vaughan, supra* at 349–50 (defining functional feature as "one that competitors would find necessary to incorporate into their product in order to be able to compete effectively"); *W.H. Brady Co. v. Lem Products, Inc.,* 659 F.Supp. 1355, 1365 (N.D.Ill.1987).

The functionality defense was developed to protect advances in functional design from being monopolized. It is designed to encourage competition and the broadest dissemination of useful design features. *LeSportsac, Inc. v. K–Mart Corp.,* 754 F.2d 71, 76 (2d Cir.1985). *See also Vaughan, supra* at 349 (functionality defense exists because granting exclusive rights to functional features of products is the domain of patent, not trademark [or trade dress] law).

In this case, Ross presented virtually no evidence, apart from the rather speculative testimony of its own president, that it would be unable to compete effectively without copying the overall appearance of the Air–Dyne trade dress. In fact, Ross' president, who designed the Ross exerciser, admitted that from the beginning, he never considered using any alternative design other than the one that duplicated the appearance of the Air–Dyne. Ross also admitted that it conducted virtually *no* engineering studies, that it prepared *no* technical drawings during the development of its initial prototypes, that it conducted *no* marketing studies, that it made *no* study of manufacturing costs, and that it had not even calculated its own costs of production.

### Design Alternatives

Schwinn presented evidence of a number of design alternatives which it claims Ross could have used in developing its exerciser. Some of these alternatives appear to infringe Schwinn's own patents, and thus obviously would not be feasible. With respect to several of the other alternatives, however, the evidence was considerably less clear as to nonfeasibility.

For example, in response to Schwinn's suggestion that a smaller-sized wheel than the 27 inch wheel (with its six blades or vanes) used in the Air–Dyne and the Ross prototype could be used, Ross' president testified only that he never considered using another size because Ross already had equipment in its plant for manufacturing a 27 inch wheel, and retooling to make a different-sized wheel would be costly. However, the evidence shows that Ross has in the past marketed another exercise bicycle, as well as regular bicycles, using a 20 inch wheel, and Ross admitted that it has

never tried to put fan blades or vanes on a wheel of that size, or done testing to determine if a small wheel (with perhaps more fan blades) could create enough air resistance to operate as well as a bike with a 27 inch wheel. Ross' president testified that the gears that would be required to achieve the same air displacement effect with a smaller wheel would be too large and too expensive to work, but since no testing has been done, that testimony is entitled to little weight. The magistrate found the evidence on the possibility of using a different-sized wheel, and whether it would work, "too speculative" to draw any conclusions from an engineering viewpoint. Since the burden of proof on the issue of functionality is on Ross, however, more concrete evidence as to the nonfeasibility of a smaller wheel was necessary.

Schwinn also suggested using a squirrel cage in place of the wheel with its fan blades. The squirrel cage, according to Schwinn, could work on the same air displacement principle and could be put into a variety of housings of many shapes, given its small size. The magistrate noted that neither Schwinn or Ross presented sufficient evidence from which any conclusions on the squirrel cage possibility could be drawn. But since Ross bore the burden of proof of showing why such an option would *not* be workable, its failure to present adequate evidence to discredit the squirrel cage alternative suggests that it is not likely to establish functionality at trial.[22]

In response to Schwinn's suggestion that Ross could make the protective fan guard or "cage"[23] surrounding the wheel out of plastic, rather than wire, Ross introduced the testimony of an "expert" on fan guards, Michael DeZinna. DeZinna testified that it would not be feasible to construct a fan guard out of plastic since that would require costly tooling and thus be prohibitively expensive. DeZinna's own fa-

miliarity, however, was only with *wire* fan guards; he admitted that he had no experience with plastic fan guards and that he had conducted no studies of plastic alternatives. At the same time, Schwinn's expert, Jay Geist, who has already designed a successful exerciser shrouded in plastic, testified that the use of a plastic fan guard on the Ross exerciser would be both practical and economical.

Ross also pointed out that the steel wire fan guard is commercially available from a number of fan guard manufacturers, and stated that it is more economical for it to buy a standard, commercially available size wire fan guard. This is because Ross does not have to invest in any machinery to manufacture it, no lead time is needed to design tools or machinery to produce the guard, and the guard is available on 3–4 week delivery after it is ordered. However, Schwinn introduced evidence that plastic fan guards are also made as part of a plastic housing for a fan, and Ross has expended virtually nothing in determining whether using plastic rather than wire might be workable.

Moreover, the mere fact that a feature of the exercise bike can be made using existing manufacturing equipment and parts inventory and will not require extensive retooling is not enough to establish functionality. In *Vaughan*, where the defendant similarly failed to expend any money in determining which features were actually necessary to the functioning of its product, the court held that "[s]uch costs of information are not the sort of costs that the functionality defense protects." *Vaughan, supra* at 351. The functionality of one product cannot be made to depend on the parts, inventory or production equipment owned by the defendant. If that were true, it would lead to the anomalous result that a bicycle manufacturer such as Ross

---

**22.** Schwinn also suggested that Ross could put the large wheel on the back, rather than the front of its exerciser. However, the evidence shows that Schwinn itself once considered such a design but rejected it because of the risk that older persons and handicapped users might fall forward without something in front of them as they were riding.

**23.** The evidence indicates that *some* sort of fan guard is clearly necessary for reasons of safety. The purpose of the fan guard is to keep fingers from getting inside the fan; it must be closed enough for that purpose but yet open enough to let air get to and from the fan itself.

could copy another's trade dress (because it had the spare parts and production equipment) while a non-bicycle manufacturer (who had neither the parts inventory or equipment) could not.

As the court recently stated in *Brunswick Corp., supra,*

> the claim may still be made that without a particular identifying design or feature a second-comer may be less effectively able to compete. If that feature must be slavishly copied in order to have an equally functional product, then the feature is not entitled to protection.... But if the feature enables the second-comer simply to market his product more effectively, it is entitled to protection.

*Id.* at 519.

Because of its failure to introduce any cost data from which any comparative findings between the Air–Dyne and the Ross prototype could be made, or any concrete evidence as to the superiority of its overall design in terms of engineering, economy of manufacture, or accommodation of utilitarian function, Ross has not sustained its burden of proof as to functionality. The evidence presented by Ross at the hearing largely ignored the evidence of available design alternatives introduced by Schwinn. The possibility that alternative configurations may exist that are feasible suggests that the Air–Dyne's trade dress is not entirely functional, and that Ross did not have to copy it in order to compete effectively in the market.

### Overall Design

The magistrate, in her report and recommendation, devoted considerable discussion to the factual functionality of various individual components of the bike, such as the handlebars, the hand grips, the bike wheel lock, the console, the small transport wheels, and the entire rear portion.[24] Schwinn, however, has never contested the *factual* functionality of individual components of the bike (i.e., that certain features of the bike serve *some purpose*); obviously, if the features had no function, they would not be employed. *See In Re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1338–41 (C.C.P.A.1982). What is at issue here is *legal* functionality. To achieve the status of "legal" functionality, a design or feature must be "superior or optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance." *Sicilia, supra* at 419.

Perhaps even more importantly, as the Seventh Circuit has stated:

> [W]hether the configuration of a machine is functional or can receive trademark protection depends on whether its *design as a whole* is superior to other designs, not on whether its *component features viewed individually* each have a function.

*Vaughan, supra* at 350 (emphasis added). *See also LeSportsac, supra* at 76 (rejecting defense of functionality where defendant broke plaintiff's trade dress down into its individual elements and then attacked certain of those elements as functional); *Textron, Inc. v. U.S. International Trade Comm'n,* 753 F.2d 1019, 1026 (Fed.Cir. 1985).

Ross argues that Schwinn's objection to a part-by-part analysis ignores the fact that the whole is necessarily the sum of its parts; it points out that both the appearance and location of each constituent part of the Ross prototype (e.g., the wheel, the wire cage, the arms, the fork covering the wheel, the locking device, and the small

---

**24.** For example, the shape and location of the handlebar arm levers is "functional" in the sense that the unbent or straight lever portion that extends down from the bent handle to the lower pivot would be weakened by bends. The levers also are conveniently located in front of the user in order to perform their intended function, and the distances that they move and the locations of the sideways bent handle grip appear to be the most logical locations for the average-sized person. The bike wheel lock, a safety device to prevent the pedals and wheel from being inadvertently moved by children, is placed so that it can be easily spotted. The fork over the wheel is also conveniently located in a place where the wheel can easily be removed. The measuring instrument box or console (a speedometer calibrated to measure work load) is located directly in front of the user, in the place where it is most visible to the person sitting on the bike.

front wheels) are dictated by each part's utilitarian characteristics, as well as by cost factors. Ross also points out that the *overall placement* of the various parts is based on the locations of four reference points which establish the exerciser's size and shape parameters in order for the bike to function. These points, which are based on the physical measurements of the average human being, are the locations of the saddle, handlebar, center of the wheel (with the drive gear mechanism) and the pedal crank. However, this design criterion appears to be satisfied by nearly every exerciser on the market, but none of the others, except for the Ross, look anything like the Air–Dyne. Thus, the rationale for the locations of the component parts of the Ross exerciser has little to do with whether Ross *had* to copy the Air–Dyne trade dress in order to compete effectively.

 Because it has failed to meet its burden of showing the unavailability of alternate configurations that would have avoided the virtual copying of the Air–Dyne's trade dress, Ross has not established that it is likely to establish functionality of its prototype at trial.[25]

## CONCLUSION

For the reasons stated above, the magistrate's use of the survey evidence at the preliminary injunction hearing was proper. The magistrate's conclusion that Schwinn is likely to show at trial that the Air–Dyne exerciser has acquired secondary meaning in the marketplace was also correct.

The magistrate erred, however, in concluding that there was less than negligible

evidence of a likelihood of consumer confusion and that Ross will be able to meet its burden of proving that the Air–Dyne is functional. The evidence introduced at the preliminary injunction hearing showed rather that Schwinn has met its burden of showing a likelihood of success on the merits and that it is entitled to a preliminary injunction.

IT IS THEREFORE ORDERED that Schwinn's motion for a preliminary injunction is granted subject to fixing a proper bond and the presentation of an injunction order on notice and motion.

---

**25.** Schwinn also complains that the magistrate improperly considered the attractiveness of the Air–Dyne and its popularity with consumers as evidence of functionality. In concluding that Ross was likely to succeed in establishing functionality, the magistrate relied in part on her finding that consumers find the big (27 inch) wheel on the Air–Dyne to be attractive. The magistrate also stated that a plastic alternative to the wire guard was not likely to be as attractive.

Some courts have considered the aesthetic appeal of a product to be one of the indicia of functionality. *See Brunswick, supra* at 519; *see also Vuitton et Fils S.A. v. J. Young Enterprises,*

*Inc.,* 644 F.2d 769, 774 (9th Cir.1981). The Seventh Circuit, however, has not adopted this approach. *W.T. Rogers, supra* at 343. As this court recently stated,

> [a] feature may serve an aesthetic function, making the product more pleasing to the consuming public which is not indifferent to such things. However, the fact that a feature makes a product more attractive does not automatically mean that the feature is 'functional.'

*W.H. Brady Co., supra* at 1365, *citing W.T. Rogers, supra* at 343. The magistrate should not, therefore, have considered attractiveness as a factor in determining functionality.