**BLOOMFIELD INDUSTRIES, DIVISION OF SPECIALTY EQUIPMENT COMPANIES, INC., a Delaware corporation, Plaintiff,**

v.

**STEWART SANDWICHES, INC., a Virginia corporation, Defendant.**

Civ. No. S 87–757.

United States District Court, N.D. Indiana, South Bend Division.

July 5, 1989.

James H. Pankow, Ind., Wm. M. Lee, Jeffrey R. Gray, Thomas E. Smith, Chicago, Ill., for plaintiff.

James D. Hall, Thomas Dodd, South Bend, Ind., Thomas J. Macpeak, Cynthia C. Dale, Robert G. McMorrow, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This cause is before this court on defendant, Stewart Sandwiches, Inc.'s ("Stewart"), Motion for Summary Judgment on the issue of Stewart's alleged trade dress infringement of plaintiff's, Bloomfield Industries ("Bloomfield"), coffee maker Model 8540. This court has jurisdiction over this cause pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338.[1] Venue is conferred on this court in accordance with 28 U.S.C. § 1391(c).[2]

Bloomfield filed its original complaint on December 31, 1987. Count I of the original

---

1. Those sections are set forth below:

   a. 15 U.S.C. § 1121—Jurisdiction of the Federal Courts. The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States (other than the United States Court of Appeals for the Federal Circuit) shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.

   b. 28 U.S.C. § 1331—Federal Question. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

   c. 28 U.S.C. § 1338—Patents, plant variety protection, copyrights, trademarks and unfair competition.

   (a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

   (b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection, or trade-mark laws.

2. § 1391 Venue generally

   .    .    .    .    .

   (c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

   .    .    .    .    .

   Defendant Stewart is a Virginia Corporation which has an office and place of business located at 51177 Bittersweet Road, Granger, Indiana, within the Northern District of Indiana, South Bend Division.

complaint alleged patent infringement by defendant Stewart. Counts II and III alleged trade dress infringement under 15 U.S.C. § 1125(a) and common law unfair competition, respectively. Stewart filed an Answer to the Complaint on February 8, 1988. The Answer included three counterclaims which alleged that the patents sued upon were invalid. On April 1, 1988, Bloomfield filed a motion for voluntary dismissal of Count I with prejudice, stating that an investigation by Bloomfield had revealed that the subject matter of all the claims of the patents in question were in prior public use or sale more than one year prior to the filing dates of the applications for the patents. This court issued an order signed April 1, 1988, which dismissed Count I of the complaint with prejudice. Stewart's counterclaims were dismissed without prejudice. Stewart filed its "Amended Answer and Counterclaims" on May 13, 1988, in open court. Various new counterclaims were asserted, some of which are not at issue here. Stewart moved for summary judgment on February 3, 1989. That motion applies only to the issue of unfair competition under both federal law (Count I) and state law (Count II) and to Stewart's counterclaim for declaratory judgment on that issue. Bloomfield filed a memorandum in opposition to the summary judgment motion and Stewart has replied. In addition, on May 9, 1989, in open court, a hearing was held on the summary judgment motion. This court took the matter under advisement at that time. It is now prepared to rule on the motion.

## I.

### Facts

This court has very carefully sifted through three affidavits, a deposition, numerous exhibits, transcripts of court hearings, plaintiff's answers to interrogatories, and all the pleadings and motions in this record, in order to ascertain the undisputed facts in this case. Those facts are set forth below.

Bloomfield is engaged in the business of manufacturing and selling products for use in the preparation and serving of food and beverages. Among other products, Bloomfield manufactures and sells coffee brewers. These coffee brewers are sold to commercial and institutional establishments such as convenience stores, retail sales outlets, schools, factories, offices, grocery stores, bowling alleys, service stations, military installations and the like. Purchasers include non-professional food industry buyers such as retail store purchasers and service station personnel. Bloomfield advertises through trade journals, direct mail advertisements, fliers, telemarketing, spec sheets and rebate coupons. Since 1976, Bloomfield has spent approximately one and one-half million dollars advertising its coffee brewers for gross sales of approximately $140,000,000.00. It is not clear whether these figures represent advertising expenses and gross sales for *all* models of Bloomfield's coffee brewers, or just for Model 8540.

Model 8540 was designed by Melvin Roberts, Vice–President for Bloomfield. This particular model has been manufactured since 1976. In 1984, in order to reduce the overall height of Model 8540, it was decided that the thickness of the base should be reduced. Apart from that change, the outward appearance of 8540 has remained the same since 1976.

Stewart is engaged in the business of manufacturing and selling sandwiches, prepackaged meats, coffee, frozen beverages and other food products. It also sells coffee brewing and grinding equipment and frozen beverage equipment. Its customers are commercial and institutional establishments such as convenience stores, retail sales outlets, schools, factories, offices, grocery stores, bowling alleys, service stations and military installations. Its competition consists of other food service providers and restaurants. Stewart also operates franchises nationally which sell Stewart's food products, including coffee. For many years, Stewart has offered a coffee service to its customers whereby it provides the equipment, coffee and servicing. Since 1985, Stewart has had its own coffee brewing equipment manufactured. It sells some of this equipment but usually pro-

vides it at no cost to its customers. For this reason, Stewart does not advertise its coffee makers as a separate item in trade publications. It does, however, distribute fliers to its customers which describe in detail its coffee makers. Stewart describes its customers as knowledgeable professionals. The Stewart coffee makers carry the registered trademark "International Brewing Systems."

Stewart was formerly a customer of Bloomfield. That is, Stewart purchased Bloomfield coffee makers for use by its own customers. For whatever reason, the relationship ended. In early 1987, Bloomfield discovered that Stewart was selling a coffee brewer which Bloomfield felt was very similar to its Model 8540. In fact, Stewart had sent a Bloomfield Model 8540 to a manufacturer in Taiwan to copy and the Stewart coffee brewer was thus created. Stewart does not deny the intentional copying.

A basic description of the Bloomfield 8540 was offered by Bloomfield in its complaint:

The Bloomfield coffee makers have a distinctive C shape design consisting of an upright parallelepiped central body, an integral parallelepiped head which extends forwardly from the stand at the top, and a flat parallelepiped base which extends forwardly from the stand at the bottom equidistant with the head. The rectangular front face of the head has a unique and distinctive control panel which features aligned rectangular switches with a signal light on one side and a water tap or faucet on the other.

A detailed description of each outer feature of the coffee maker was supplied in Bloomfield's answer to Stewart's interrogatory number eighteen (18):

The coffeemaker has a thin, flat base with substantially invisible feet, making the base appear to float on the countertop. The base has a dish-shaped warmer plate with an upwardly curving lip disposed above the top of the burner base. The vertical body sits on the rear part of the base and tapers slightly toward its top as viewed from the side. The front

of the body and the top of the base are of one-piece construction joined together in a large radius at their juncture. The head or top portion, has a rectangular box-shaped configuration with rectangular front, back and side panels, and the top of the head is flat except for the burner and fill spout. The head has a rectangular pour-in fill spout at the top. The controls, consisting of an array of horizontally aligned rectangular switches for operating the coffeemaker, are located at the bottom half of the front panel of the head. On the underside of the head the sprayer has a unique hole configuration, and the brew chamber which hangs from the bottom of the head below the sprayer has a distinctive shape and handle configuration.

The Bloomfield coffee makers all bear one of several Bloomfield trademarks, i.e., Koffee–King, Module 3, Integrity, Koffee Kleen and Silex.

Bloomfield manufactures and sells other models of coffee makers which differ in appearance from one another. Only the trade dress of Model 8540 is at issue in this case.

The Stewart coffee maker can be described as very similar but not identical to the Bloomfield 8540. The specifications are shown for comparison purposes in Appendix A. The specs show that the measurements of the two models differ slightly. The Bloomfield is 16⅞″ tall while the Stewart is 17¾″ tall. From back to front, the Bloomfield measures 14 inches while the Stewart measures 17½ inches. The Stewart has two top burners while the Bloomfield has just one. The Stewart has a hot water faucet on the left side of the front of the machine, the Bloomfield's hot water faucet is on the right. The faucets are also different colors. The position of the ready-to-brew lights is also reversed. The Bloomfield light is round while the Stewart light is square. The Stewart light also appears to function as a switch. The face plates are not alike. Bloomfield's face plate is rectangular and, as is evident from several photographs submitted as evidence, is dark on the top half and light on the

bottom. Stewart's face plate is angled somewhat and is all one dark color. Finally, where the top portion is attached to the upright column portion on the Bloomfield, there appears to be a "step". In other words, the top portion is slightly narrower in width than the column portion. The Stewart, on the other hand, has one smooth line from the top to the bottom of the coffee maker; the base, column and top are all the same width. There may be other differences and/or similarities between the two models but this court has neither seen the actual machines, nor are the photographs submitted as exhibits to the various affidavits and pleadings of much help. The photocopies are poor quality, prohibiting close scrutiny of detail. One picture, which is identified as a Stewart (Hann Deposition, Exhibit 2), shows an unmarked coffee maker which appears to have all the above-mentioned features of a Stewart but which stands on visible metal "legs" unlike another photograph of an alleged Stewart which seems to have the same type of invisible "legs" that the Bloomfield has. A photograph of a Bloomfield (Roberts Affidavit, Exhibit A) clearly shows a circular metal piece attached to the front of the column portion of the machine which does not seem to appear on the photographs of the Stewart models.

Stewart has also submitted as exhibits in support of its summary judgment motion, photocopies of advertisements of various other brands of coffee makers and various Bloomfield models (Defendant's exhibits 5–19). Again, most of the photocopies are poor quality and it is difficult to study details in design differences. However, it is clear that all coffee makers are basically made up of bases, columns, top portions, burners, brewing baskets and switches. Most seem to be made primarily of stainless steel. Many have hot water faucets which either protrude from the front or from one side of the top portion of the brewer. Switches are placed on the top portions, bases and even on the columns. Brewers vary in size and may have as many as seven burners.

In support of its "Memorandum in Opposition to Defendant's Motion for Summary Judgment," Bloomfield submitted the deposition of David William Hann taken March 14, 1989. At the time of the deposition, Hann was Director of Operations for E.A. Sween Co., also known as Deli Express Convenience Foods ("Deli"). In the Spring of 1986, Hann had had the opportunity to oversee a "test" by his company of the Stewart coffee maker. He wrote a memorandum to the president of Deli, Les Moore, on April 15, 1986 (Hann deposition, Exhibit 1), which concluded that the Stewart coffee brewer was "definitely of inferior quality than the current Silex product" (Silex is one of Bloomfield's trademarks). Hann represented that he was very knowledgeable with respect to various coffee brewers on the market, especially the Bloomfield models. Hann said he believed he could distinguish from a group of brewers without labels, Bloomfield coffee makers from other brands. He stated that the Bloomfield and Stewart brewers were "very, very similar" in appearance but had some minor cosmetic differences. He also stated that:

[W]hile all coffee brewers of this commercial type are similar in some ways, most of them are distinctive in appearance. I believe I could identify several manufacturers by appearance alone. I don't to my knowledge know of a brewer that is in appearance [as] similar to the Bloomfield brewer.

Hann also stated that he believed it might be more difficult to determine the Stewart brewer, as he knows it, from the Bloomfield. When asked to list distinctive features of a Bloomfield coffee maker, Hann said that they were "simple looking", "clean", "boxy", without a lot of extra decoration, and had a narrow base. A final note on the Hann deposition may or may not be significant; that is, Hann admitted that Deli and Stewart were, at the time of the deposition, involved in some kind of dispute related to the purchase by Deli of one of the Stewart franchises.

This court will now attempt to apply the undisputed facts to the issue of trade dress infringement in the context of a summary judgment motion.

## II.

*The Law of Trade Dress Infringement*

■ A Seventh Circuit case written by Judge Coffey and decided on February 27, 1989, entitled *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176 (7th Cir.1989), is of utmost relevance to the case now before this court. In *Schwinn*, the Court of Appeals was asked to review the district court's decision to grant a preliminary injunction to Schwinn against Ross, prohibiting Ross from marketing its "Futura" exercise bicycle. The case involved a trade dress dispute in which Schwinn claimed that Ross' Futura infringed on its popular Air–Dyne in its outward appearance. The Seventh Circuit took the opportunity in *Schwinn* to carefully explain the factors a court must consider in any trade dress infringement action. First, the court described a product's trade dress as "the overall image used to present it to its purchasers; it could thus include ... the product's size, shape, color, graphics, packaging and label." *Schwinn*, 870 F.2d at 1182, citing *Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346 (7th Cir.1987). The court then stated:

> In a trade dress infringement action the manufacturer must establish either that its trade dress has acquired "secondary meaning" or that its trade dress is a "distinctive, identifying mark." The manufacturer must also establish that consumers will be "likely confused" as to the source of the product because of the similarity of the products' appearance ... even if both of the first two requirements are satisfied a plaintiff cannot prevail if the alleged appropriated trade dress is found to be "functional."

*Id.* at 1182–83 (citations and some punctuation omitted). In a footnote, the court noted that "each of these elements—secondary meaning [or distinctiveness], likelihood of confusion, and functionality—must be separately considered. *Id.* at 1183 *citing Schwinn Bicycle Co. v. Ross Bicycles*, 678 F.Supp. 1336, 1341 (N.D.Ill.1988). Therefore, in a trade dress action, the fact finder must determine separately whether (1) a product is distinctive or if not, has acquired secondary meaning, *and* (2) whether a purchaser will likely be confused as to the source of the product *and* (3) if the trade dress is functional. Each of these elements are considered by the fact finder in view of certain factors. Factors to be considered in finding whether or not a trade dress is *inherently distinctive* may include:

1. Whether the trade dress is arbitrary;

2. Whether the trade dress serves no function to describe the product or assist in its effective packaging;

3. Whether the design is a common basic shape or design, whether it is unique in a particular field, or whether it is a mere refinement of a commonly adopted and well-known design.

*See, AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974 (11th Cir.1986); *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981); *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977); *Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1160–1163 (N.D.Ill.1987).

Factors to be considered to determine whether a noninherently distinctive design has acquired *secondary meaning* include:

1. Direct Consumer testimony;

2. Consumer surveys;

3. Exclusivity, length and manner of use;

4. Amount and manner of advertising;

5. Amount of sales and number of customers;

6. Established place in the market;

7. Proof of intentional copying.

*See, e.g., Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).

When determining the *likelihood of confusion*, a court must consider the following factors or "digits of confusion":

1. The type of trademark;

2. The similarity of design;

3. Similarity of products;

4. Identity of retail outlets and purchasers;

5. Identity of the advertising media utilized;

6. Actual confusion;

7. Intentional copying.

*Schwinn*, 870 F.2d at 1185. In *Schwinn*, the court emphasized that none of the factors by themselves are dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *Id.* at 1185. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.

*Id.* at 1187.

■ Finally, factors a judge should consider in examining a functionality defense may include:

1. Whether a particular feature or design is one that would be costly to design around rather than costly to have;

2. Whether the feature or design is necessary to afford a competitor the means to compete effectively;

3. Whether the feature or design is shared by other brands on the market;

4. Whether the feature or design is aesthetically functional, that is, has the attractiveness of the design become so important to consumers that continued trademark protection of that design would destroy the ability to compete effectively?

*Schwinn*, 870 F.2d at 1188–1191. The ultimate focus, stated the *Schwinn* court, is on effective competition. *Id.* at 1191. The plaintiff (Bloomfield) bears the burden of proof on the distinctiveness/secondary meaning and likelihood of confusion issues. *Schwinn*, 870 F.2d at 1182. The defendant (Stewart) bears the burden on the issue of functionality which is a defense to trade dress infringement. *Id.* at 1190.

This court will now proceed to analyze all these factors in light of Rule 56 standards.

## III.

### *Summary Judgment*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure (Fed.R.Civ.P. 56); *accord Arkwright–Boston Manufacturers Mutual Ins. Co. v. Wausau Paper Mills Co.*, 818 F.2d 591, 593 (7th Cir.1987). A material question of fact is a question which will be outcome-determinative of an issue in that case. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984).

Recently the Supreme Court of the United States took the opportunity to address Rule 56, Fed.R.Civ.P. In two cases decided on the same day, the Court has expanded the scope of the application of Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

After *Celotex* it is clear that a non-moving party may not rest on its pleadings to avoid summary judgment. 106 S.Ct. at 2554. *See also Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987). The initial burden is on the moving party to demonstrate " 'with or without supporting affidavits' " the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 106 S.Ct. at 2553 (quoting Rule 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.* Furthermore, in *Anderson*, the Court held that what facts are material in a specific case shall be determined by the

substantive law controlling that case or issue. 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that the courts analyze summary judgment motions utilizing the standard of proof relevant to that case or issue. *Id.* at 2512–2513. For recent academic insight into *Celotex* and *Anderson*, see Childress, *A New Era For Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183–194 (1987). At page 194 thereof, the author states:

> The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgments, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987). A recent object lesson applying these ideas is found in *Richardson v. Penfold,* 839 F.2d 392 (7th Cir.1988). *See also* Jamison–Bey v. Thieret, *867 F.2d 1046 (7th Cir.1989). For an exact and recent analysis on this subject, see Friedenthal,* Cases on Summary Judgment: Has There Been a Material Change in Standards? *63 Notre Dame L.Rev. 770 (1988).*

### A. Inherent Distinctiveness/Secondary Meaning

■ The first issue this court must address is whether the Bloomfield coffee maker is inherently "distinctive" or, in the alternative, whether it has acquired secondary meaning. Although Mr. Hann used the word "distinctive" to describe the Bloomfield 8540, he used it in the sense that, due to his extensive knowledge of various coffee brewers, he himself could distinguish an 8540 from other models. That assertion has little relevance to *inherent* distinctiveness. In light of the factors previously mentioned, this court finds that there is nothing about Bloomfield's trade dress as a whole which is arbitrary or which fails to serve a useful function. As Bloomfield's third-party witness Mr. Hann noted, the Bloomfield coffee maker is simple, clean and boxy without extra decoration. The basic shape of the coffee maker is common to all or most coffee makers on the market. It is not unique in its field, but shares characteristics common to other coffee makers. It is a mere refinement of a basic coffee maker in perhaps its most streamlined form. It is therefore not "inherently distinctive."

■ Alternatively, a finding of secondary meaning would suffice to establish protectability because such a finding means that notwithstanding the indistinctiveness of the trade dress, the consuming public has come to associate that trade dress with plaintiff's product. *AmBrit,* 805 F.2d at 979.

As discussed above, secondary meaning factors include consumer testimony and surveys, length of use, advertising, sales, established place in the market and proof of intentional copying. *See, supra.* Just two of these factors are not in dispute. First, Stewart does not deny that it directly copied the Bloomfield 8540. Direct copying is one factor to be considered in a court's determination of whether secondary meaning has been acquired but it does *not* create a presumption of secondary meaning as Judge Coffey so emphatically stressed in *Schwinn.* It is also clear that the Bloomfield Model 8540 was first marketed in 1976. However, the base of this model was changed in 1984. Therefore, the trade dress of 8540 as it appears today has been marketed for approximately five years. The "length of use" factor is therefore also not in dispute. This court does not feel that secondary meaning has either been established nor has it been disproved for purposes of summary judgment. A much more comprehensive factual overview is necessary to decide the issue of secondary meaning. More evidence is needed to determine whether actual purchasers are able to identify and distinguish a Bloomfield 8540 from other coffee maker models. Bloomfield has offered as evidence Mr. Hann's deposition. Mr. Hann is a professional purchaser of coffee makers. Mr.

Hann claims that he can distinguish and identify Model 8540's. Bloomfield then, has at least presented evidence that raises a factual issue with regard to secondary meaning. The testimony of one purchaser however, will not suffice to prove secondary meaning by a preponderance of the evidence. There is vital information relevant to this issue which is still unclear to this court. The class of purchasers, for example, needs to be clarified. It appears to include both professional and nonprofessional buyers. Stewart describes its customers as "knowledgeable professionals" yet it sells to the same types of commercial and institutional establishments as Bloomfield, so it must sell to non-professional coffee maker purchasers as well (e.g., service station owners). Stewart apparently provides its coffee-brewing equipment at no cost to its customers more than it actually sells such equipment. The question then arises whether Stewart and Bloomfield actually deal with the same class of purchasers.

There also remain questions as to Bloomfield's advertising and sales figures. Certain figures were presented in Bloomfield's answer to Stewart's interrogatories and in Ziols' affidavit but it was not specified whether the figures applied to all Bloomfield coffee makers or just the models at issue. This court therefore is unable to determine the relevance of that evidence.

Several questions of fact remain on the issue of secondary meaning which this court feels are both genuine and material.

### B.  Likelihood of Confusion

█   If Bloomfield could carry its burden of proving that its trade dress is protectable under the Lanham Act, it would then have to prove that the protectable trade dress is being infringed by Stewart by showing that purchasers would likely be confused believing the Stewart was the Bloomfield 8540.

This court must consider factors such as similarity of design and labeling, identity of purchasers, similarity of advertising media utilized, actual confusion and intentional copying. *See, supra.* There is no question

that the Stewart and Bloomfield products are very similar in design although not identical. However, it is also true that all coffee makers are similar in design. In fact, Mr. Hann, a knowledgeable buyer of coffee makers, stated in his deposition that if a group of brewers (various brands) were presented to him without labels, only by very close inspection would he be able to distinguish them. Because Stewart intentionally copied the Bloomfield design, the Stewart product is undoubtedly more like Bloomfield Model 8540 than others. These factors tend to show likelihood of confusion. On the other hand, looking at the advertising factor, it appears that the two companies do not utilize the same advertising media. Bloomfield advertises extensively in trade journals such as *Restaurants & Institutions, Food Management, Nation's Restaurant News, Restaurant & Business, Restaurant Hospitality, Institutional Distribution Equipment Specialists, Convenient Store News, World Coffee and Tea, Automatic Merchandiser,* and *Food Service Product News.* Bloomfield also advertises through catalogs, spec sheets and fliers, rebate coupons and trade shows. Stewart apparently does not advertise its coffee makers as a separate item in print publications. It does distribute fliers but evidently that is the extent of the advertising of the Stewart coffee maker. The two products are therefore not promoted in a similar manner. This tends to show less chance of confusion. Also, no evidence of actual confusion has been offered. Such evidence would also support a claim of likelihood of confusion. Finally, labels may be an important factor to take into acccount in assessing the likelihood of confusion. *Schwinn,* 870 F.2d at 1187. Bloomfield's labels are totally dissimilar to Stewart's labels. However, a question of fact exists as to whether the Stewart coffee makers are always distributed and/or sold with a label. Several pictures of Stewart coffee makers which were submitted as evidence in this case do *not* have labels. Stewart insists that the alleged infringing coffee makers all carry labels but the pictures create a factual question.

In determining this issue, at least one other factor may be material. That is, who exactly purchases the coffee makers and how knowledgeable are those purchasers? Both parties claim that they sell to both professional and non-professional buyers. Stewart claims that virtually all its purchasers are knowledgeable professionals. Stewart also claims that most of its coffee makers are offered at no cost as a service to its customers. Yet this court has no evidence of number of units actually sold by each party and how many units were purchased by which type of consumer. If Stewart's sales numbers are very small and a large percentage of those sales are made to knowledgeable professionals, obviously, there would be little likelihood of confusion. This factual matter has not been well documented by the parties and is material to a finding of likelihood of confusion.

### C. Functionality

■ The defense of functionality may be utilized to show that a particular trade dress is not protectable. In evaluating the merits of the defense, a court must decide whether the design in question is necessary to afford a competitor the means to *compete effectively.* If so, it is functional and therefore not protectable. Factors may include cost of designing around the trade dress, aesthetic value to consumers, and whether other brands on the market employ the same design. *See, supra.* Although each part of a design may be functional, in a trade dress infringement action, the design as a whole may still be non-functional if it is only one of many ways the functional parts may be put together. *Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1123 (7th Cir.1988); *Vaughan Manufacturing Co. v. Brikam,* 814 F.2d 346, 350 (7th Cir.1987); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987). In other words, the functional parts may not be put together in a way that is likely to confuse consumers if it is possible to put those parts together in a

different way and still compete effectively. *Fuddruckers,* 826 F.2d at 842, n. 7.

As noted previously, Stewart bears the burden of proving that Bloomfield's trade dress is functional and therefore not protectable. Stewart has attempted to do this by (1) pointing out that every element of Bloomfield's design can be found on another brand of coffee maker, (2) showing that Bloomfield's advertising uses the term "highly functional hot beverage center," (3) stating that plaintiff has the burden of proving that there are alternative coffee maker designs which can perform the same functions with no significant increase in cost, and (4) using statements from Bloomfield patents which assert advantages of a particular design to show functionality.

First, Stewart is mistaken in asserting that Bloomfield bears the burden of proving its design is not functional. As *Schwinn* made clear, functionality is a defense. *Schwinn,* 870 F.2d at 1190. Stewart bears the burden of proving the Bloomfield design is functional. Stewart's advertising argument is also unconvincing. The term "highly functional" as used in Bloomfield's advertising is nothing more than a sales pitch describing the coffee brewer itself, not its trade dress. It does not in any way prove that the Bloomfield trade dress is "functional" as that term is used in relation to trade dress infringement law.[3] The patent argument is not very relevant, either. It pertains only to individual elements of Bloomfield's trade dress. There is no question that parts of said trade dress are functional. However, it must again be emphasized that functionality of trade dress takes into account the *whole* design, not the various elements separately. The advertising argument and the patent argument are both based on a passage from *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1340–41 (C.C.P.A.1982) which states in relevant part:

> Previous opinions of this court have discussed what evidence is useful to demonstrate that a particular design is "su-

---

3. "Functional" for purposes of a trade dress infringement case means not that the feature or design serves a function, but that the feature is

necessary to afford a competitor the means to compete effectively. *Schwinn,* 870 F.2d at 1188.

perior." In *In re Shenango Ceramics, Inc.*, 53 CCPA 1268, 1273, 362 F.2d 287, 291, 150 USPQ 115, 119 (1966), the court noted that the existence of an expired utility patent which disclosed the *utilitarian advantage of the design* sought to be registered as a trademark was *evidence* that it was "functional".... It may also be significant that the originator of the design touts its utilitarian advantages through advertising.

*Id.* (omitting some citations, emphasis in the original). It should be noted that in *Schwinn*, the Seventh Circuit rejected use of the word "superior" as not integral to this circuit's approach. *Schwinn*, 870 F.2d at 1189. That is not to say that the Seventh Circuit would discount evidence such as that considered in *Morton–Norwich*. However, it is clear from *Schwinn* that the Seventh Circuit would place little importance on such evidence unless it was pertinent to the "effective competition" issue which is the ultimate focus in a functionality question. *Schwinn*, 870 F.2d at 1191. Evidence which Stewart should have employed to support is functionality defense would have emphasized cost and availability of alternative designs [4] and whether the

attractiveness (or aesthetic value) of the Bloomfield design was so important to purchasers that protection of that design would destroy competitors' abilities to compete effectively. *Id.* at 1188–91; *W.T. Rogers Co. Inc. v. Keene*, 778 F.2d 334, 347 (7th Cir.1985). Stewart did properly point out the fact that each element of the Bloomfield design is shared by other brands. *Id.* at 1190. This evidence is highly relevant to functionality of the design as a whole but is not necessarily determinative. The fact of the matter is, all coffee makers are basically alike.[5] This may or may not mean that one particular brand such as Bloomfield Model 8540 has a protectable trade dress. There are obviously many alternative designs. More evidence is needed to make such a determination. Therefore, certain genuine factual matters remain unresolved as to the defense of functionality.

## IV.

### Conclusion

Because genuine issues of material fact remain, the court must DENY defendant Stewart's Motion for Summary Judgment.

IT IS SO ORDERED.

4. Available design alternatives are evidence that a particular trade dress is non-functional. *Morton–Norwich*, 671 F.2d at 1341. The nature, price and utility of the various alternatives are issues of fact which may not be suitable for determination by summary judgment. *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir.1987).

5. All brands of coffee brewers which have been mentioned by the parties share the following features:

a. All have a base, column portion and top portion;
b. All have warming plates;
c. All have controls, either switches or knobs, placed in various locations on the brewer;
d. All have a coffee "basket" which hangs from the top portion of the brewer.
All brewers perform the same function, that is, they all deliver hot water filtered through coffee grounds to a container which rests on a burner.

## APPENDIX 'A

FRONT VIEW

SIDE VIEW

BLOOMFIELD

FRONT                LEFT SIDE

STEWART